# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

DENISE E. EADES,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY, agent of Michael
J. Astrue,

      Defendant.

No. 09-CV-3049-DEO

MEMORANDUM OPINION AND ORDER

_____

## TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . 1
     A.   The ALJ's Decision  . . . . . . . . . . . . . . 3

II.  LAW AND ANALYSIS . . . . . . . . . . . . . . . . 6

III. CONCLUSION . . . . . . . . . . . . . . . . . . . 21

## I.   INTRODUCTION AND BACKGROUND

Plaintiff, Denise E. Eades, (hereinafter "Eades"), seeks Supplemental Security Income ("SSI") benefits and files this action seeking review of the Commissioner's decision that she is not disabled under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. (the "Act.") Tr. 66-68. This Court has authority to review a final decision by the Commissioner under 42 U.S.C. § 405(g), as incorporated into Title XVI by 42

U.S.C. § 1383(c)(3).

Eades claims she is disabled because of depression, anxiety, social anxiety disorder, attention deficit disorder (ADD), arthritis, and allergies. Tr. 73. Eades alleges a disability onset date of July 25, 2005, which represents the day she saw Dr. Anjum Bashir, a psychiatrist at Seasons Center. Tr. 60.

Eades was born on September 9, 1980, and was 26 years old on the date on which the ALJ issued his decision. She is now 30 years old. When she was younger, Eades was placed in foster care on two separate occasions while her mother dealt with problems surrounding bipolar disorder. Eades has a high school education, which she obtained through some special education classes. She also has her Associate degree in journalism and photography, a two-year degree that took her approximately six years to obtain. Eades has no past relevant work experience, but has worked several jobs that the Court will discuss in greater detail below.

In July 2005, Eades sought treatment for her mental impairments at the Seasons Center. The administrative record reveals Seasons Center treatment records through March 2007.

Tr. 179-197, 219-270. Over the course of her treatment at the Seasons Center, Eades saw psychiatrists Anjum Bashir and Barbara McCabe, Advanced Registered Nurse Practitioner ("ARNP") Nancy Howe, Licensed Independent Social Worker ("LISW") Sandy Pelzer, and Independent Living Specialist Jennifer Kaufman.

Eades also saw two consultative physicians over the course of her disability application and administrative appeal. Dr. Brett Olson conducted a physical consultative examination of Eades on August 31, 2005. Tr. 170-174. Psychiatrist Paul Anderson examined Eades on April 18, 2007, and testified about her impairments at the April 30, 2007, ALJ hearing. Tr. 287-289, 293-301. Furthermore, Disability Determination Services conducted a mental residual functional capacity assessment and completed a psychiatric review technique form on September 21, 2005, and February 16, 2006. Tr. 198-201, 202-216.

**A.   The ALJ's Decision**

The ALJ uses a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. A claimant must prove: (1) that he has not engaged

in substantial gainful activity; (2) that he has a medically determinable severe impairment, as that term is defined in the regulations; and *either* (3) that his impairment meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is presumed to be disabled, and no further analysis is needed); *or* (4) that his impairment prevents him from performing his past relevant work. 20 C.F.R. § 404.1520. If the claimant carries his burden to this point, then the burden shifts to the Commissioner to prove there are other jobs the claimant can perform. <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006); <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).

In this case, the ALJ determined at step one that Eades had not engaged in substantial gainful activity since August 15, 2005, her application date. Tr. 16. At step two, the ALJ determined that Eades had severe impairments of attention deficit hyperactivity disorder (ADHD) and social anxiety disorder. Tr. 16. At step three, the ALJ found that Eades did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925

and 416.926).  Tr. 16.

At step four, the ALJ found that Eades possessed no physical limitations and assessed her with the following residual functional capacity:

> to perform a full range of work at all exertional levels.  From a mental standpoint, [Eades] is capable of understanding, remembering, and carrying out simple and routine tasks, but not detailed and complex tasks, and would be able to tolerate brief, superficial and infrequent contact with the public, co-workers, and supervisors.

Tr. 17.  In arriving at this finding, the ALJ evaluated Eades' credibility and subjective complaints of pain.  Tr. 17-21.  In doing so, the ALJ cited to 20 C.F.R. § 416.929, and the requirements and factors outlined in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) and Social Security Ruling ("SSR") 96-7p.  The ALJ noted that, at the ALJ hearing, Eades testified she was unable to work due to the symptoms described in the summary of the medical evidence set forth in the ALJ's decision.  The ALJ found that although Eades described daily activities which were fairly limited, her allegations could not be verified with a reasonable degree of certainty, and "several material inconsistencies and incongruities exist

5

between [Eades'] testimony, the medical evidence, and the record as a whole." Tr. 21. The ALJ noted several inconsistencies regarding Eades' allegations of the amount of sleep she requires (Tr. 27, 28), her difficulty of being around large groups (Tr. 27), past abuse (Tr. 27-28), noncompliance with medication (Tr. 28-29), and her impairments as they related to her education at Iowa Lakes Community College and prior work at Hardee's (Tr. 29). The ALJ also provided a mostly comprehensive review of Eades' medical records in his decision, absent a number of Seasons Center records the Court will discuss below.

## II. LAW AND ANALYSIS

In reviewing this case, the Court is required to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but it is enough that a reasonable mind would find it adequate to support the ALJ's decision. See Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). As long as there is substantial evidence in the record that supports the

ALJ's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. See Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Still, in reviewing the record this Court must remain mindful of the ALJ's "duty to develop the record fully and fairly" in the non-adversarial administrative proceeding. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

In this case, the Court is persuaded the ALJ's decision that Eades is not disabled is not supported by substantial evidence on the record as a whole. Because Eades has no past relevant work experience, the ultimate question before the Court is whether, at step 5, the ALJ met his burden by proving that there were jobs in the national economy Eades could perform given her mental impairments. To determine whether a

claimant can perform other jobs in the national economy, the Commissioner must consider whether the claimant can actually find and hold a job in the real world.  See Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir. 1984).  Under SSR 96-8p, a person's residual functional capacity must be evaluated based upon work performed on a regular and continuing basis, which means eight hours a day for five days a week or an equivalent work schedule.  The Commissioner's position is that, "at step five of the disability determination, 'only an ability [on the part of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled.'" Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000).  Also, "a finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." Becker v. Astrue, 676 F. Supp. 2d 813, 822 (S.D. Iowa 2009) (quoting Singletary v. Bowen, 798 F.2d 818, 822 (5th Cir. 1986)).

Substantial evidence of Eades' work history, mental

impairments, and therapy treatment notes reveals that the
ALJ's decision that Eades was not disabled was in error. More
specifically, the ALJ's conclusion that Eades could perform
work at step 5, meaning she could work on a full-time basis,
is not supported by substantial evidence. Eades' own
testimony, her mother's testimony, consultative psychiatrist
Dr. Anderson's testimony, Dr. Olson's consultative report, and
most importantly, her therapy treatment notes at Seasons
Center reveal that she is not employable on a full-time basis
as a result of her impairments.

At the ALJ hearing, Eades testified there was no type of
full-time work she could do because every time she tried, she
would break down and cry. Tr. 309. She claimed working full
time was too stressful. Tr. 310. While she had been trying
to see if she could work and apply for jobs, she couldn't
promise she could do so. Tr. 317.

At the ALJ hearing, Eades' mother, Sandy Poyzer, was
asked whether she believed her daughter was capable of
performing full-time employment. Poyzer stated, "well the way
it affects her as time goes on[,] the length of a job seems to
affect her. I don't know, you can't find jobs that only allow

a couple of hours.  Most hours, jobs have eight hours..."  She continued, "[Eades] can't seem to handle an eight-hour shift. She goes into some type of fit or something that she just can't handle time.  She, as time goes on it affects her and I don't know what it is."  Tr. 329.

Two consultative physicians, Dr. Anderson and Dr. Olson, also suggested after personally examining Eades that she could not work as a result of her mental impairments.  At the ALJ hearing, Dr. Anderson testified as follows:

> Q:  Do you think that she's capable of going out in a competitive work environment and functioning in a full time job?

> A:  I think she's capable at trying to but I don't think she's capable at doing it.  She's had repeated failures in that, in trying to although she keeps trying to do it.  It's because she's misunderstood and she misunderstands others and they don't interpret her actions as being a good employee.

Tr. 297.  In his report, Dr. Olson stated:

> In terms of her working capability, I really feel that she is not going to be hired by an employer in a regular work capacity whether it is factory work or retail work or some other type of work unless she is under the direction of structured work program like Echo Plus or some other program that could find her work

10

> with the appropriate limitations which I
> think mainly are her mental aptitude and
> social abilities.

Tr. 171-172.

The ALJ gave "little" weight to Dr. Anderson's opinion (Tr. 25-27) and "no" weight to Dr. Olson's (Tr. 23). As to Dr. Olson, the ALJ reasoned that his opinion was on an area outside of his expertise, that no psychiatric evaluation and/or opinion was requested from him, that the evaluation occurred only one month after Eades had started treatment, and that his opinion was on an issue reserved to the Commissioner pursuant to SSR 96-5p. Tr. 23. The ALJ gave little weight to Dr. Anderson primarily because his opinion was inconsistent with the treating opinions at the Seasons Center. The ALJ further noted that Dr. Anderson testified with the incorrect understanding that Eades had been hospitalized for her mental impairments, when she in fact had never received such treatment. The ALJ also concluded that Anderson's assessment of Eades' GAF score at 45 was inconsistent with the record as a whole, including Eades' psychiatrists and nurse practitioner at Seasons Center, who generally assessed Eades with a GAF score between 68 and 72. Tr. 27.

With respect to Dr. Anderson's testimony that she had been hospitalized, his consultative report, in which he assessed Eades a GAF score of 45 and stated, "we have a lady here who does not appear to be very high functioning yet she's a high school graduate and has managed to obtain an AA degree," he expressly noted that she had not been hospitalized. Tr. 287. Thus, his GAF assessment was a 45 even when he had in mind that she was never hospitalized.

With respect to the ALJ's conclusion that Dr. Anderson's GAF score was inconsistent with the treating sources at Seasons Center, this conclusion is not wholly supported by the evidence in the record. As mentioned, Dr. Anderson assessed Eades a GAF score of 45, which the ALJ concluded was inconsistent with the other evidence in the record; specifically, the Seasons Center treatment notes of Dr. Bashir, Dr. McCabe, and ARNP Howe. In the ALJ's decision, he quite thoroughly cited the GAF findings of Dr. McCabe and ARNP Howe, who treated Eades beginning in or around April 2006 and October 2006, respectively. He cited these findings and treatment notes as evidence "that [Eades] had realized significant improvement in her mental health symptoms in a

short period of time with appropriate treatment and that her symptoms were generally fairly well-controlled with prescribed medication." Tr. 23. The ALJ, however, did not discuss the treatment notes and opinions of counselors Pelzer or Kaufman. These notes reveal a much greater severity of impairment than the notes of Bashir, McCabe, and Howe, including how Eades' impairments affected her ability to work.

Indeed, Dr. Anderson's assessment of the severity of Eades' impairments was consistent with Pelzer's assessments. Pelzer saw Eades approximately twenty-one times in 2005 and 2006, far more than any treating source on which the ALJ relied. Pelzer assessed Eades' highest GAF scores toward the beginning of her treatment, from August to October of 2005. Subsequently, her scores dropped significantly, which shows that her level of functioning worsened even during times she was compliant with her medication.

On February 2, 2006, Pelzer noted that Eades felt more depressed and was missing classes more frequently. She noted that Eades broke up with her boyfriend and that Eades was keeping herself from making friends. Pelzer assessed Eades a GAF score of 50. Tr. 269.

On March 23, 2006, Pelzer noted that Eades was very angry with the therapist and that Eades could not function in her chorus class. She stated that Eades had not slept well for three weeks. Pelzer also noted that Eades was not able to accept or follow any of her suggestions. She assessed Eades a GAF score of 30.[1] Tr. 251.

On April 24, 2006, Pelzer noted that Eades had just returned from a chorus trip "exhausted." She stated that Eades had a new boyfriend, and that her ADHD was acting up. She also noted that Eades was "still hearing voices, soft whispering in background," and that Eades couldn't make out what the voices were saying. Pelzer assessed Eades a GAF score of 40. Tr. 248.

On October 26, 2006, Pelzer stated that Eades was experiencing panic and depression over her internship. She stated, "[Eades] has had difficulty coping with [the] stress

_____

[1] A GAF score of 30 reflects the following condition: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. 2000).

of [her] internship." She noted that Eades lacked the required hours and was unable to cope with the structure of the supervising photographer. During the session, Eades was crying and pale. Pelzer noted that Eades had cried and been panicked for two days. Pelzer assessed Eades a GAF score of 50. Tr. 227.

The ALJ cited Independent Living Specialist Jennifer Kaufman's attempt to assist Eades with job hunting as evidence that, "despite any mental health symptoms and limitations [Eades] experienced, it was believed that she remained capable of performing some type of work activity." Tr. 24. Kaufman's treatment notes reveal, however, that she also assisted Eades numerous times with completing her application and appeal for disability. On or about February 7, 2006, Kaufman noted that she and Eades "discussed finding an attorney to help her receive disability." Tr. 265. In her diagnostic assessment, Kaufman stated, "We have 8 sessions to work on daily living skills and decision making skills. Also assist with paperwork for disability." Tr. 263. On March 7, 2006, Kaufman and Eades focused a part of their session on calling Social Security to obtain paperwork for her administrative appeal.

Tr. 254. On March 21, 2006, the focus of the session was "working on paperwork for disability." Kaufman stated, "[Eades] brought her paperwork from Social Security. This is the third time she [illegible] it out. We discussed if [the application] comes back denied to obtain an attorney." Tr. 252. On April 6, 2006, Kaufman noted that she worked with Eades on completing her disability paperwork because Eades had not yet finished it. She noted that she encouraged Eades to mail the paperwork that day or the next. Tr. 250. Thus, while Kaufman's notes also stated, on a number of occasions, that Kaufman was doing what she could to assist Eades in finding a job, the Court does not suspect Kaufman would also spend valuable face time by assisting Eades with her Social Security application if she believed it was not worthwhile. To the contrary, these treatment notes are not consistent with an opinion that Eades is capable of performing full-time employment.

Eades' treatment records at Seasons Center specifically address the effect of her impairment on her employability. The Seasons Center progress notes of Pelzer and Kaufman often show that her occupational and educational impairment was a

"3," which represents a "severe" impairment and the most impaired rating available on the progress note. Tr. 180, 184, 227, 231, 246, 247, 250, 251, 252, 254, 255, 256, 268, 269.

As mentioned, the ALJ erred by not discussing the many records of Pelzer and Kaufman. While Pelzer and Kaufman may not be "acceptable medical sources" under 20 C.F.R. § 404.1513(a), their opinions constitute "other" medical sources under § 404.1513(d)(1). Moreover, Pelzer and Kaufman served alongside the treating psychiatrists and nurses as a part of a team approach to Eades' treatment at Seasons Center. As the Eighth Circuit explained in Shontos v. Barnhart, 328 F.3d 418 (8th Cir. 2003), therapists such as Pelzer and Kaufman are "appropriate sources of evidence regarding the severity of a claimant's impairment, and the effect of the impairment on a claimant's ability to work." Shontos, 328 F.3d at 426. The ALJ's analysis of Eades' medical records was comprehensive but for his analysis of Eades' Seasons Center records. This Court recognizes that Pelzer's and Kaufman's notes are not entirely consistent with Dr. McCabe's and ARNP Howe's, but when looking at the records of Pelzer, Kaufman, Anderson, Olson, and the testimony of Eades' mother, the

17

record is clear that Eades' impairments were quite severe.[2]
The ALJ should have, at a minimum, addressed or attempted to
reconcile the disparity of Eades' GAF scores at Seasons
Center.  See Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir.
2009) ("The history of GAF scores at 50 or below, taken as a
whole, indicate [the claimant] has 'serious symptoms ... or
any serious impairment in social, occupational or school
functioning....'") (citing Brueggemann v. Barnhart, 348 F.3d
689, 695 (8th Cir. 2003) ("noting a GAF score of 50 reflects
a serious limitation on a claimant's ability to perform basic
life tasks; VE testified that an individual with a GAF score
of 50 could not work.")).

     Finally, Eades' own employment history reveals that even
if she attempted to work full-time, and assuming she could

_____

     [2]  The Court further notes that ARNP Howe's GAF
assessments are not consistent.  For example, on October 2,
2006, Howe assessed Eades a GAF score of 68.   Tr. 229.
However, her notes show that Eades was very depressed and
tearful, was sleeping too much, and was complaining a lot of
mood lability and low energy.   On November 13, 2006, Howe
stated that Eades hadn't had any tearful episodes or periods
of irritability, that her energy had improved, and was excited
about her own apartment she obtained with HUD funding.   Howe
assessed Eades a GAF score of 70, only two points higher than
her October 2, 2006, assessment, when the severity of Eades'
impairments was remarkably worse.

find a job, she would suffer the same disabling problems and would not be able to keep a job for any significant period of time. Eades worked nearly full-time as a cashier at Alco in 2003. Tr. 83. This employment apparently lasted only one month. Eades testified that the employment ended because it was too much stress and because she broke down and cried in front of her manager. Tr. 305.

Before her employment at Alco, Eades worked at Dollar General stocking shelves and cashiering. Tr. 306. Eades stated this position started as a full-time commitment, but that Dollar General cut her hours down to one hour a week because she was not fast enough. Tr. 307. Similar to her troubles at Alco, Eades broke down in front of her manager and quit. Tr. 307.

Eades' most recent attempt at employment was as a cleaner for Hardee's. Tr. 103-105. In the work performance assessment dated August 19, 2005, Eades' manager reported that Eades worked approximately 5 - 6 hours per week. She described her work performance as adequate and good.[3] Tr.

_____

[3] While Defendant argues that this work performance assessment is evidence that Eades is employable, the Court
(continued...)

103.  Her employment, however, apparently ended after Hardee's stopped scheduling her without notice.

To complete Eades' degree requirements at Iowa Lakes Community College, she was required to complete an internship. She interned for a photography company, and the record shows she experienced much anxiety and depression over this experience.  She also reported having difficulties completing the required hours.  On June 20, 2006, Eades expressed to Kaufman her anxiety problems with completing her internship. Tr. 240.  On November 14, 2006, just as she had done in front of her prior employers, Eades informed Kaufman that she broke down in front of her internship supervisor.  Tr. 225.

Eades' best attempts at full-time employment ended with her breaking down in front of her supervisors and quitting her jobs.  Even while she was being treated for her impairments, she broke down in front of her internship supervisor.  No reasonable employer would tolerate this behavior.  The record

---

[3](...continued)
must consider the assessment in context.  Eades worked minimal hours at Hardee's.  There is no evidence the assessment would have been so glowing had Eades worked there eight hours a day for five days a week.

in this case does not support any conclusion that Eades is employable.

## III.    CONCLUSION

For the reasons stated herein, the Court is persuaded that substantial evidence in the record does not support the ALJ's finding that Eades is not disabled. Substantial evidence shows that there are no jobs in the national economy she could perform given her mental impairments. The Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record contains sufficient evidence to allow the Court to render this decision.

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Eades with an onset date of July 25, 2005.

A timely application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not

appealed, and Eades' attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 30th day of September, 2010.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa